NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0390n.06
Filed: July 1, 2008

No. 07-3801


UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MELISSA AVERY,

     Plaintiff-Appellant,

v.

JOINT TOWNSHIP DISTRICT MEMORIAL
HOSPITAL,

     Defendant-Appellee.

                               /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO


BEFORE:     KEITH, CLAY, and GILMAN, Circuit Judges.

     **CLAY, Circuit Judge.** Plaintiff Melissa Avery appeals the district court's order granting

summary judgment to Defendant Joint Township District Memorial Hospital on Avery's claims of

wrongful discharge in violation of public policy, intentional infliction of emotional distress, and

fraud. For the reasons set forth below, we **AFFIRM** the decision of the district court.


**BACKGROUND**

A.     **Substantive Facts**

Plaintiff Melissa Avery was hired by Joint Township District Memorial Hospital ("the Hospital") in December 2002 as a part-time registered nurse, an at-will employee, in the Labor and Delivery department. In the first year and a half of Avery's employment, the Hospital had no complaints about Avery's work performance. In the fall of 2004, the Hospital claims that Avery's work began to suffer because of her attention to a spa business she had opened with her husband. In November 2004, Avery's supervisor, Diane Wagner, claims to have received complaints regarding Avery's work performance. According to Wagner's notes, on November 4, 2004, Wagner talked to a nurse who complained about Avery running her business while she was working at the Hospital. Wagner received complaints about Avery's use of hospital phones to conduct her personal business, her solicitation of patients to become customers of her salon, Avery improperly giving medical advice to patients over the phone, and Avery's sloppy charting of deliveries.

Avery claims that the Hospital's reports of problems with her performance began only after she assisted midwife Bridget Heckler and nurse Maria Kindig with the difficult delivery of a baby girl on November 5, 2004. During the delivery, the vital signs of the baby and mother were being monitored electronically by an Electronic Fetal Heart Monitor that printed a monitor strip, a sheet of paper documenting vital signs, as the information was being recorded. Avery was responsible for noting on the monitor strip when significant events such as the delivery occurred. According to Avery, the delivery proceeded well until the baby's head was visible at 5:29 p.m., but the umbilical cord was wrapped around the baby's neck. Heckler clamped and cut the umbilical cord at 5:30 p.m., resulting in the baby having no oxygen source. A heart rate of sixty beats per minute was recorded by the monitor at this point. According to Avery, because the baby's shoulders were stuck, Heckler

2

needed to turn the mother on her side in order for the baby to be delivered. Avery claims that the baby was not breathing and had no heartbeat when it was delivered and taken to the warmer at 5:34 p.m. Heckler then successfully resuscitated the infant. After the baby was out of danger, Avery recorded the time of delivery as 5:32 p.m. in a handwritten notation on the monitor strip.[1] Avery claims that this notation was based on Heckler's or Kindig's recollection of the time of delivery. After the delivery, Avery claims that Heckler wrote "maternal" under the monitor strip's record of a 60 beat per minute heart rate even though the recorded heart rate was the baby's. Heckler also documented that the delivery occurred without complications.

On November 10, 2004, Wagner met with Avery to discuss complaints regarding her performance. Wagner told Avery that Heckler was upset because Avery had not accurately noted the time of birth during the November 5, 2004 delivery. Heckler had stated that neither Avery nor the other nurse assisting with the delivery had known exactly when the baby was delivered and that it was Avery's responsibility as the lead nurse to note the time of birth. Heckler believed that the baby had been delivered within seconds of the umbilical cord being cut, much earlier than 5:32 p.m. Focusing on the fact that Heckler believed the time of delivery was earlier than the time Avery noted, Wagner claimed that the way Avery had charted the delivery would look bad in a court of law. While reviewing the monitor strip with Wagner, Avery explained her charting and showed what she claimed was the baby's heart rate continuing for several minutes after the umbilical cord was clamped and cut. Wagner noted that the interpretation of monitor strips was subjective and that the

---

[1] The monitor strip produced by the Hospital during discovery is missing this handwritten notation.

correct interpretation was hard to prove. When Avery claimed that her notation of the time of birth was correct, Wagner suggested that perhaps the clock in the room and the clock in the monitoring device were not synchronized. Avery went to the room and determined that the clocks were synchronized. In the course of their discussion, Avery asked Wagner whether she was being asked to change her charting or to "lose the monitor strip." (J.A. 164.) Wagner responded by describing how, when Wagner was a young nurse, a supervisor had asked her to change her records, and she had refused. Wagner told Avery that she was not being asked to change her charting.

At the same meeting, Wagner confronted Avery about her use of the Hospital's resources and her work time to conduct personal business. Wagner noted complaints regarding Avery's solicitation of business from hospital patients, and Avery agreed to stop conducting her spa business during work hours. Wagner also said that Heckler was upset that Avery had given Heckler's patient advice about how to induce labor over the phone.

After meeting with Avery, Wagner received a complaint that Avery had taken a day off work at the Hospital, claiming that she could not find a babysitter, when in fact she was working at her spa. Additionally, the relatives of a patient complained that Avery had obtained confidential information and used it to fire an employee at her spa business. According to Avery, she requested information regarding a patient because one of Avery's employees claimed that she may have been exposed to spinal meningitis and could not be at work for fear of infecting others. Avery called the emergency room and asked if anyone had been admitted with spinal meningitis. When the emergency room staff responded that there was no confirmation of a spinal meningitis case, Avery relayed the information to her employee. Avery fired the employee the next week, although Avery

claims that the employee was terminated for unrelated performance issues. Wagner discussed this matter with Art Swain, the Hospital's Vice President of Human Resources and Support Services. Swain concluded that Avery's conduct violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936. According to Swain, the HIPAA violation occurred not solely because Avery called the emergency room about the spinal meningitis patient but also because she shared the information with someone outside the hospital. Swain and Wagner subsequently decided that Avery would be terminated.

On December 8, 2004, Wagner met with Avery and terminated her employment. Wagner claimed that Avery's termination was based in large part on Avery's HIPAA violation. According to Avery, the termination caused her to be depressed, gain thirty pounds, and experience chest pain and an elevated heart rate. Avery was prescribed Toprol by her family doctor for her chest pains.

## B. Procedural History

On June 27, 2005, Avery brought a wrongful discharge complaint in Ohio state court against the Hospital for her dismissal from her registered nurse position. Avery subsequently entered a voluntary dismissal of the suit without prejudice and filed suit in United States District Court for the Northern District of Ohio claiming that she was wrongfully discharged in violation of public policy, that the Hospital intentionally inflicted emotional distress upon Avery, that the Hospital engaged in negligent misidentification, that the Hospital breached its contract with Avery, and that the Hospital engaged in fraud. The Hospital filed a motion for summary judgment, which was granted by the district court on May 25, 2007.

Avery filed a timely notice of appeal on June 15, 2007. Avery appeals the district court's grant of summary judgment on her claims of wrongful termination in violation of public policy, intentional infliction of emotional distress, and fraud.

## DISCUSSION

### Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Blackmore v. Kalamazoo County,* 390 F.3d 890, 894-95 (6th Cir. 2004). Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To support its motion, the moving party may show "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. While all inferences must be drawn in favor of the nonmoving party, this Court is under no obligation to imagine favorable facts where the nonmoving party has alleged none. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Inasmuch as this is a diversity case, this Court must apply Ohio law "in accordance with the then controlling decision of the highest state court." *Grantham & Mann, Inc. v. American Safety*

*Products, Inc.*, 831 F.2d 596, 608 (6th Cir. 1987). If the Ohio Supreme Court has yet to address an issue, this Court must decide the issue using all relevant data. *Allstate Ins. Co. v. Thrifty Rent-A-Car Systems, Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [Ohio] Supreme Court would decide otherwise." *Id.* (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995)).

## I. *GREELEY* CLAIM

Employment in Ohio is generally governed by the common law doctrine of employment at will. *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 529 (Ohio 2002). Under this doctrine, both the employer and the employee are free to end the employment relationship for any reason, and as a result, an employee may not bring suit for wrongful discharge. *Id.* However, in *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990), the Ohio Supreme Court joined the many state courts that recognize an exception to this doctrine when an employee has been wrongfully discharged in violation of public policy. *Id.* at 986. In *Greeley* an employee was fired because of a court order requiring his wages to be garnished for child support payments. *Id.* at 983. His discharge was in direct contravention of Ohio Revised Code § 3113.213, a statutory provision that prohibits the termination of employees because of wage garnishment orders. *Id.* The *Greeley* court held that although employers are generally permitted to terminate at-will employees for any reason, a termination in violation of an Ohio statute could lead to tort liability for wrongful discharge in violation of public policy. *Id.* at 986.

Although the *Greeley* court recognized this cause of action only for employees who had been discharged in violation of a statute, the Ohio Supreme Court later expanded the wrongful discharge tort's scope to encompass employees who had been discharged in violation of the Ohio and United States Constitutions, administrative rules and regulations, and the common law. *Painter v. Graley*, 639 N.E.2d 51, 56 (Ohio 1994). The *Painter* court specified that "the public policy alleged to have been violated [must be] of equally serious import as the violation of a statute." *Id.* Since first recognizing the tort, often referred to as a *"Greeley* claim," the Ohio Supreme Court has set forth four elements that must be satisfied for a wrongful discharge in violation of public policy action to succeed:

1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Id.* (quoting Henry H. Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cin. L. Rev. 397, 398-99 (1989)).

**1.     Clarity**

Avery asserts that she was terminated in an effort by the Hospital to cover up the actual facts of the November 5, 2004 delivery. To establish the clarity element of the *Greeley* claim, Avery must demonstrate the existence of an established public policy in violation of which she was discharged. Avery attempts to maintain a *Greeley* claim based on either the Hospital's violation of the public

policy embodied in Ohio's Whistleblower Act, Ohio Revised Code § 4113.52, or the public policy against the falsification of medical records. The Hospital contends that Avery cannot maintain a claim based on either of these policies. For the reasons set forth below, we find that Avery's claim does not satisfy the clarity element for the violation of public policy protecting whistleblowers, but it does satisfy the clarity element for the violation of public policy against falsification of medical records.

###### a.        Whistleblower Act

The Ohio Whistleblower Act prohibits an employer from retaliating against an employee who reports the employer's wrongdoing. Ohio Rev. Code § 4113.52. Unless the wrongdoing consists of the commission of one of a limited class of criminal offenses (not at issue in this case), in order to be protected by the Whistleblower Act, the employee must notify her supervisor both orally and in writing of the wrongdoing to allow the employer the opportunity to rectify the situation. Ohio Rev. Code § 4113.52(A). The employee must also file suit within 180 days of the employer's retaliatory action in order to recover civil damages. Ohio Rev. Code § 4113.52(D).

Despite the existence of statutory enforcement measures within the act itself, Ohio courts recognize the public policy favoring whistleblowing embodied in Ohio's Whistleblower Act as a basis for a common law wrongful discharge in violation of public policy claim. *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 322 (Ohio 1997). Ohio courts have interpreted the public policy expressed by the Whistleblower Act narrowly, reasoning that: "[b]y imposing strict and detailed requirements on certain whistleblowers and restricting the statute's applicability to a narrow set of circumstances, the legislature clearly intended to encourage whistleblowing only to the extent that

the employee complies with the dictates of R.C. 4113.52." *Id.* at 322-23. As a result, an employee who has not complied with the statute's reporting or procedural requirements may not base a *Greeley* claim upon the policy embodied in the Whistleblower Act. *See Contreras v. Ferro Corp.*, 652 N.E.2d 940, 946 (Ohio 1995).

In the instant case, it is uncontested that Avery did not comply with the Whistleblower Act's requirements for reporting and filing suit. Avery did not file a written report regarding the alleged cover-up of the November 5, 2004 delivery, nor did she bring suit under the Whistleblower Act within 180 days of her discharge from the Hospital. As a result, Avery cannot base her wrongful discharge action upon the Whistleblower Act, and the only viable basis for her *Greeley* claim is the Hospital's violation of the public policy against the falsification of medical records.

### b.       Falsification of Medical Records

Avery cites a variety of cases, criminal statutes, and administrative regulations to support her contention that Ohio has a public policy against the falsification of medical records. Avery cites Ohio Administrative Code § 4723-4-06(E), requiring nurses to accurately document observations; Ohio Administrative Code § 4723-4-06(G), prohibiting the falsification of patient records; and Ohio Revised Code § 2913.42(A)(1), prohibiting the falsification of records.[2] Avery also cites *Doyle v. Bethesda Hospital Assn.*, No. CT96-0014, 1996 WL 752547 (Ohio Ct. App. Oct. 23, 1996)

---

[2]Avery also cites Ohio Administrative Code § 4723-4-03(D)(3) as a basis for the public policy against the falsification of records. However, this provision deals with the credentials required of nurses and is unrelated to Avery's argument.

The relationship between another of Avery's sources of public policy, Ohio Revised Code § 2921.12(A), which prohibits tampering with evidence related to an official proceeding, and the public policy against the falsification of medical records also seems somewhat tenuous since the records in question had no relationship to any pending or likely official proceeding.

(unpublished). In *Doyle*, a nurse alleged that she was fired because she refused to delete from her notes information regarding patient care. The Ohio Court of Appeals held that if the plaintiff's allegations were true, the plaintiff was discharged in violation of Ohio public policy because "[h]ospitals should not be permitted to alter information about patient care to avoid potential liability." *Doyle*, 1996 WL 752547, at *2. Given the abundance of authority prohibiting the falsification of medical records, Avery has demonstrated the existence of a clearly established public policy upon which she may base her *Greeley* claim.

The Hospital argues that Avery cannot maintain a claim based upon the policy against the falsification of medical records because this would essentially be a claim based upon the principles embodied in the Whistleblower statute. In support of its arguments, the Hospital notes that Avery's claim that she was asked to alter medical charts is refuted by her own deposition testimony. The Hospital asserts that excluding this claim, Avery is alleging only that she was fired for reporting Bridget Heckler's alteration of medical records, a quintessential whistleblower claim. Although we agree that Avery's testimony contradicts her assertion that her supervisor asked her to alter medical information, an inquiry into the factual basis for Avery's public policy claim is not helpful in determining whether Avery is alleging the violation of a clearly established policy. This Court's analysis of the first *Greeley* element must focus on the policy Avery has identified and not on the actual circumstances of her termination.

On the other hand, even if the Hospital's argument is well-taken, and the only violation of public policy that Avery could allege arose from the Hospital's discharge of Avery for reporting Heckler's falsification of medical records, Avery's claim would not be precluded by her failure to

follow the procedures of the Ohio Whistleblower Act. The Hospital cites a variety of Ohio Court of Appeals cases for the proposition that Ohio law precludes the success of a claim that involves the public policy in favor of whistleblowing (even though cast as involving a different policy that does not specifically prohibit employer retaliation) if the plaintiff has not met the requirements of the Whistleblower Act. The Hospital relies in particular upon *Evans v. PHTG, Inc*., No. 2001-T-0054, 2002 WL 1401476 (Ohio Ct. App. June 28, 2002). *Evans* involved an employee who brought a claim for wrongful discharge in violation of public policy due to her discharge for reporting her employer's performance of an unlicensed medical procedure in violation of state law. The Court of Appeals found that because the Ohio statute that prohibited the performance of unauthorized medical procedures did not prohibit retaliation against employees for reporting such conduct, Evans' claim was actually based on the Whistleblower Act. *Evans,* 2002 WL 1401476, at *5. Since Evans did not comply with the procedural requirements of the Whistleblower Act, the court held that Evans could not pursue a wrongful discharge in violation of public policy claim. *Id.* at *6. The reasoning in *Evans* is undermined by a series of Ohio Supreme Court cases which make clear that despite non-compliance with the Whistleblower Act, a plaintiff can base a *Greeley* claim on her termination in retaliation for reporting conduct that violates Ohio public policy.

In an early case involving the interaction between the Whistleblower Act and other public policies, *Kulch v. Structural Fibers*, 677 N.E.2d 308 (Ohio 1997), the Ohio Supreme Court held that an employee who claimed that his employer retaliated against him for reporting an OSHA violation could bring a wrongful discharge in violation of public policy claim based on Ohio's public policy

12

favoring workplace safety as well as the policy promoting whistleblowing. Despite the possibility

that Kulch had complied with the Whistleblower Act, the *Kulch* court specifically held:

> [A]n at-will employee who is discharged or disciplined for filing a complaint with OSHA concerning matters of health and safety in the workplace is entitled to maintain a common-law tort action against the employer for wrongful discharge/discipline in violation of public policy pursuant to *Greeley*, 49 Ohio St. 3d 228, 551 N.E.2d 981, and its progeny. Thus, appellant is entitled to maintain a *Greeley* claim against appellees **whether or not he complied with the dictates of R.C. 4113.52** in reporting his employer to OSHA.

*Kulch*, 677 N.E.2d at 328-29 (emphasis added). Because *Kulch* involved federal statutes that

specifically prohibit employers from retaliating against employees who report OSHA violations,

*Kulch* could be read narrowly to allow plaintiffs to pursue *Greeley* claims for retaliation despite their

failure to comply with the Whistleblower Act only when the policy relied upon specifically

condemns retaliation. However, later Ohio Supreme Court precedent has made this narrow view of

*Kulch* implausible.

The Ohio Supreme Court reaffirmed *Kulch*'s holding in *Pytlinski v. Brocar Products, Inc.*,

760 N.E.2d 385 (Ohio 2002). The *Pytlinski* court held that the statute of limitations for the

Whistleblower Act does not govern a wrongful discharge in violation of public policy claim even

if the public policy could be cast as either a whistleblower protection or a workplace safety policy.

The Ohio Supreme Court held:

> Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted. Therefore, Pytlinski is not bound by the statute of limitations set forth in R.C. 4113.52 because his cause of action is not based upon that statute, but is, instead, based in common law for violation of public policy.

13

*Pytlinski*, 760 N.E.2d at 388. The *Pytlinski* court found that an independent *Greeley* claim existed for a violation of the Ohio policy favoring workplace safety without referencing any statute that prohibited retaliation for reporting workplace safety issues. The court cited a variety of Ohio statutes favoring workplace safety that had been cited in *Kulch*. *Pytlinski*, 760 N.E.2d at 387 n.2. Although *Kulch* also discussed the policy embodied in a federal statute that specifically prohibits employers from retaliating against employees who report OSHA violations, this statute was inapplicable to Pytlinski because he had not reported the violations to OSHA. *Id.* at 388. Thus, *Pytlinski*'s holding allows Avery to pursue a wrongful discharge claim based upon the policy against the falsification of medical records even though her whistleblower claim is foreclosed.

In *Krickler v. Brooklyn*, 776 N.E.2d 119 (Ohio Ct. App. 2002), the Eighth District of the Ohio Court of Appeals squarely addressed this issue and reached a conclusion opposite to that of the *Evans* court:

> While *Kulch* might have been interpreted to deny a claim based on the workplace alcohol policy by finding it an inappropriate attempt to avoid compliance with the whistleblower statute, this interpretation is no longer viable. Under *Pytlinski*, Krickler can maintain her suit based on the workplace alcohol policy, because "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted."

*Krickler*, 776 N.E.2d at 124 (quoting *Pytlinski*, 760 N.E.2d at 388). The *Krickler* court's interpretation of *Pytlinski* is more consistent with the Ohio Supreme Court's holding than that of *Evans*. *See also Jamison v. American Showa, Inc.*, No. 99CAE-03-014, 2000 WL 1404 (Ohio Ct. App. Dec. 16, 1999) (finding an employee fired in retaliation for reporting environmental concerns could bring *Greeley* claim based on environmental laws and EPA regulations despite non-compliance with Whistleblower Act). Therefore, Ohio Supreme Court precedent allows Avery to

14

bring a *Greeley* claim based on the public policy against the falsification of medical records despite her failure to meet the procedural requirements of the Ohio Whistleblower Act. Nevertheless, Avery's claim ultimately fails due to her inability to satisfy the jeopardy element of her *Greeley* claim, as explained below.

## 2. Jeopardy

The parties also dispute whether Avery has satisfied the jeopardy element of her *Greeley* claim. Ohio courts have been unclear as to the requirements for a plaintiff to prove that her discharge put public policy in jeopardy. This Court has applied a three-part analysis to the jeopardy issue in which the court must:

> (1) determine what kind of conduct is necessary to further the public policy at issue; (2) decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal.

*Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003) (quoting *Perritt*, *supra*, at 408) (internal quotation marks omitted).

The conduct of employees who refuse to falsify records at the request of their superiors is necessary to further the public policy of preventing the falsification of medical records. Avery claims that her conduct was of this nature, yet the evidence she has presented does not support her contention. Avery asked her supervisor whether she wanted Avery to falsify medical records, and Wagner responded in the negative. Contrary to her arguments at the district court and on appeal, Avery herself admitted that Wagner was not trying to coerce her into falsifying medical records.

Avery also claims that she was fired for reporting the falsification of records. Allowing employees to be terminated for reporting such conduct would also undermine Ohio's public policy

15

against the falsification of medical records. The Hospital argues that Avery's claim does not satisfy the jeopardy element based upon her failure to give the Hospital notice that she was vindicating a government policy. For this argument, the Hospital relies upon this Court's decision in *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655 (6th Cir. 2005).

In *Jermer* an employee alleged that he was discharged for his complaints regarding the air quality at Siemens' facility. Employees at Siemens had complained about the air quality, and following air quality testing, changes were made to the facility's air filtration systems. *Id.* at 657. After the changes were made, Jermer requested a special air filter due to his sinus problems and a co-worker's cough. *Id.* He also mentioned to a supervisor that he thought there were still issues with the air. *Id.* Jermer was subsequently terminated during a reduction in force. *Id.* Jermer brought a *Greeley* claim alleging that he was terminated for complaints about air quality in contravention of Ohio's public policy favoring workplace safety. *Jermer*, 395 F.3d at 655. This Court concluded that Jermer had not established the jeopardy element. *Id.* at 660. In reaching this conclusion, this Court reasoned that allowing terminations such as Jermer's would not undermine Ohio's public policy of ensuring workplace safety because Siemens was not given notice that Jermer's complaints were connected to this public policy. *Id.*

The *Jermer* court made clear that a specific statement by an employee describing in detail the government policy being violated is not necessary for an employee to bring a *Greeley* claim. This Court found that Jermer's request for an air filter was insufficient because it merely indicated Jermer's preference, and his off-hand statement that there were still issues with the air was vague. *Jermer*, 395 F.3d at 659. The court likened Jermer's statements "to a request to turn the air

conditioner or heat up or down. . . . It does not assert or in any reasonable way indicate that an employee is acting to protect 'public policy.'" *Id.* at 659-60. However, the *Jermer* court noted that "an employee need not cite a specific statute or law." *Id.* at 659. Instead, the employee's "statements must indicate to a reasonable employer that he is invoking governmental policy in support of, or as the basis for, his complaints." *Id.* at 659.

Avery's discussion of Heckler's falsification of records similarly does not satisfy the jeopardy requirement. Avery made statements regarding the inaccuracy of Heckler's account of the November 5, 2004 delivery while she was defending herself against Heckler's accusations of sloppy charting. Avery claimed that Heckler's recollection of the time of delivery was mistaken and that Heckler's designation of the heart rate on the monitor strip as the maternal heart rate was inaccurate. Avery made no report of Heckler's wrongdoing, and Avery's statements could be seen by the Hospital as a defense of her performance and not as a report of the violation of a government policy. Thus Avery's claim cannot satisfy the jeopardy element.

Ultimately, Avery's *Greeley* claim cannot withstand summary judgment. Avery's claim that she was terminated in violation of Ohio's public policy favoring whistleblowers, a policy embodied in Ohio's Whistleblower Act, fails because Ohio courts have determined that an essential aspect of this public policy is the protection of only those persons who comply with the statute's procedural requirements, requirements that Avery did not follow. In addition, the aspects of Avery's *Greeley* claim that satisfy the clarity element fail the jeopardy element because the policy against the falsification of records was not put in danger by Avery's dismissal.

## II. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

In order to prevail on an intentional infliction of emotional distress claim, Avery must prove that (1) the Hospital intended to cause emotional distress or knew or should have know that its conduct would have resulted in emotional distress; (2) the Hospital's conduct was extreme and outrageous; (3) that the Hospital's conduct was the proximate cause of Avery's injury; and (4) that Avery's mental anguish is serious. *Yeager v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio 1983) *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007).

The district court granted the Hospital summary judgment on Avery's intentional infliction of emotional distress claim because there was no evidence that the Hospital's conduct was extreme or outrageous and because Avery did not prove that she suffered from serious mental anguish. Avery claims that the Hospital engaged in extreme and outrageous conduct by falsely citing a blatant HIPAA violation as the reason for her termination and that she suffered serious mental anguish as the result of her termination.

> Ohio courts have construed "extreme and outrageous conduct" narrowly, stating:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Yeager*, 453 N.E.2d at 671 (quoting Restatement of the Law 2d, Torts (1965) 73, Section 46, cmt d). Avery claims that Hospital's conduct was more disturbing than the conduct involved in many cases in which courts have determined that a defendant engaged in extreme and outrageous conduct.

*Jacobs v. Gupta*, No. 1-99-85, 2000 WL 567831 (Ohio Ct. App. May 11, 2000) (finding extreme and outrageous conduct where doctor engaged in a pattern of offensive sexual advances toward a nurse, which included holding her against her will and trying to kiss her); *Radcliff v. Steen Electric, Inc., et al.*, 84 N.E.2d 794 (Ohio Ct. App. 2005) (finding extreme and outrageous conduct where an employer condoned the behavior of an employee who exposed his penis or simulated a sex act in front of a co-worker and her son); *Ross v. TRW, Inc.*, 570 N.E.2d 1076 (Ohio 1991) (finding extreme and outrageous conduct where an employer terminated an employee and made the employee the target of a federal investigation for the employee's implementation of improper accounting practices that he had been ordered to implement and was told were legitimate).

Avery's argument is meritless. The Hospital has shown that there is an absence of evidence that the termination of Avery's employment rises to the level of "extreme and outrageous conduct." Avery alleges that Swain and Wagner intentionally falsely accused her of violating HIPAA. On the contrary, the deposition testimony establishes that both Wagner and Swain continue to believe that Avery's conduct constituted a HIPAA violation. To support her argument, Avery points to various points in the deposition at which Swain and Wagner agree that simply calling the emergency room to determine whether a spinal meningitis patient was admitted is not necessarily a HIPAA violation. However, Avery fails to mention that Swain and Wagner viewed the communication of the information Avery received from the emergency room to someone outside the hospital as a serious HIPAA violation. Thus, the evidence before the district court, viewed in the light most favorable to Avery does not support any allegation of extreme or outrageous behavior on the part of Wagner and Swain as the result of their firing Avery for a HIPAA violation. As a result, the district court

19

properly granted the Hospital summary judgment on Avery's intentional infliction of emotional distress claim.

## III. FRAUD CLAIM

Avery claims that the Hospital engaged in fraud because she was terminated based upon false allegations of a blatant HIPAA violation. To prevail on her fraud claim, Avery must prove:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Ross v. TRW, Inc.*, 570 N.E.2d 1076, 1083 (Ohio 1991). Avery's claim fails because the Hospital's representation that Avery violated HIPAA was a representation of law and not of fact and because there is no evidence of falsity.

Ohio courts have determined that a representation of law amounts to an opinion and therefore cannot form the basis for a fraud claim unless there is a fiduciary relationship between the parties. *Lynch v. Dial Finance Co. of Ohio No. 1, Inc.*, 656 N.E.2d 714, 720 (Ohio Ct. App. 1995). Therefore, Avery's employer's statement that Avery violated HIPAA is not actionable for fraud. In addition, Avery cannot prove the falsity element of her fraud claim. For the reasons discussed above in disposing of Avery's intentional infliction of emotional distress claim, Avery cannot show that the allegation that she had committed a HIPAA violation was "made falsely, with knowledge of its falsity, or with . . . utter disregard and recklessness as to whether it is true or false." *Ross*, 570 N.E.2d at 1083. The uncontested evidence shows that after investigating Avery's conduct, Swain

and Wagner believed that Avery had violated HIPAA by releasing patient information. As a result,

Avery's fraud claim cannot succeed.

For the reasons stated above, this Court **AFFIRMS** the judgment of the district court.