NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0030n.06

No. 18-4111

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|                                      |   |
|--------------------------------------|---|
| SUSAN BENDER,                        | ) |
|                                      | ) |
|       Plaintiff-Appellant,           | ) |
|                                      | ) |
| v.                                   | ) |
|                                      | ) |
| CHAMPLAIN ENTERPRISES, LLC,          | ) |
|                                      | ) |
|       Defendant-Appellee.            | ) |

**FILED**
Jan 21, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

**Before: WHITE, BUSH, and LARSEN, Circuit Judges.**

**JOHN K. BUSH, Circuit Judge.** Susan Bender asks this court to reverse the district court's grant of summary judgment to Champlain Enterprises LLC, d.b.a. CommutAir ("CommutAir"), on Bender's wrongful-termination claim. Bender, who was an at-will employee, claims that she was fired in violation of Ohio public policy for making safety-related complaints to her employer. She, however, failed to provide clear notice to CommutAir that she was invoking a governmental policy in her complaints. Thus, Bender's dismissal did not jeopardize any public policy, and the facts of her case do not trigger Ohio's public-policy exception to the at-will employment doctrine. We therefore **AFFIRM** the district court's grant of summary judgment to CommutAir.

**I.**

CommutAir, a regional airline partner for United Airlines, hired Bender as a technical writer in its Technical Publications Department ("Tech Pubs"), which oversees the processing and formatting of operations and maintenance manuals pertaining to aircrafts, crews, and various other

operations. Each manual undergoes an intensive multi-step review process before revisions are issued. As part of this process, technical writers in the Tech Pubs department format and revise the manuals, with the help of aviation experts who provide the substantive edits. The manuals are then reviewed by the Federal Aviation Administration ("FAA") before the manuals are disseminated to pilots.

Shortly after Bender was hired in September 2015, Joan Callahan was promoted to senior manager of the Tech Pubs department. That was when the trouble began. From the get-go, Bender had issues with Callahan, and throughout her employment, Bender repeatedly emailed Callahan's superiors with complaints about Callahan's performance.

For example, from October 2015 through March 2016, Bender complained to Callahan's supervisors, Justin Conrad and Jake Lofting, in person and via email, stating that Callahan was "not giving us the information we need." R. 27-2, PageID 241–42. Bender also asserted that Callahan was not giving writers information needed to complete tasks. When she did give writers information or files, Callahan sometimes gave "the wrong revision, the wrong chapters, outdated information." *Id.* at PageID 244. Also, according to Bender, Callahan did not know how to properly operate the software needed to compile manuals; whenever Callahan gave Bender's documents back to her with corrections, the documents were replete with formatting issues. Consequently, Bender had "to spend extra time fixing all of this," which affected deadlines. *Id.* at PageID 245, 275. In an April email, Bender stated that she "subtl[y]" tried to show Callahan the right way to format the documents "without offending" Callahan. *Id.* at PageID 275.

At no point in these communications did Bender mention any safety concerns. Rather, the thrust of Bender's complaints was that Callahan was an inexperienced supervisor. But the complaints went nowhere. According to Bender, Conrad and Lofting either defended Callahan or failed to respond to the complaints.

According to affidavits submitted by CommutAir, Bender also complained to her co-workers about Callahan. In July 2016, she told Marko Nenadovic, another technical writer, that someone else "deserved to be promoted to Manager of Tech Pubs instead of [Callahan]" and that they could not trust Callahan. R. 27-6, PageID 348. Bender also said that Callahan "sabotage[d] our work, t[ook] credit for our work, messe[d] up our files due to her lack of knowledge of the software and ke[pt] important things from us so we would fail." *Id.* Again, Bender did not raise any safety concerns.

In September 2016, Nenadovic told Callahan about Bender's complaints and, in turn, Callahan informed Lofting, Conrad, and Denise Daniels, CommutAir's HR Manager. They decided Callahan would counsel Bender "one-on-one" to try to "repair the relationship." R. 27-7, PageID 351. Apparently as a result of this counseling, Callahan filled out a positive evaluation for Bender in October 2016. Similarly, Bender noted on her evaluation that "Callahan is amazing, very bright and talented." R. 27-2, PageID 281.

The rapprochement was short-lived: by the next month, Bender had resumed the conflict. In November 2016, Bender emailed Callahan with disagreements about Callahan's idea for new quality-control procedures because Bender believed the new procedures would add extra time and "make the process very cumbersome," and Bender thought that Callahan "may not realize how much work is involved." R. 27-2, PageID 283–84. Bender did not state that these quality-control issues raised any safety concerns.

On December 8, 2016, when Bender needed to print documents for an impending deadline, Bender discovered that the printer was broken and Callahan had not fixed it. Thinking that Callahan was "retaliating" against her, Bender emailed Lofting and Conrad and suggested that (1) Tech Pubs should put in place "more documented procedures" for things such as formatting; (2) Bender and the other writers had not been properly trained on certain programs and should be

trained; and (3) "the printer needed cleaning and was jamming." *Id.* at PageID 251, 285. Again, Bender did not state that any of her issues with Callahan related to safety.

On December 14, 2016, Bender sent a six-page email to Conrad, Lofting, and David Hewitt, the Employee Relations Manager, titled "Important." *Id.* at PageID 286. The email contained a list of purported Callahan shortcomings. For example, Bender asserted that Callahan had talked negatively about another employee within earshot of Bender. In addition, Bender stated that Callahan had provided little, if any, training, even though she would ask Bender to complete certain tasks for which Bender had never previously received training. Similarly, Callahan had not properly trained other writers, so Bender created training videos for the other writers and Callahan.

Bender suggested that Tech Pubs should have documented procedures to "protect[] both the company and the employees and . . . prevent[] problems . . . from occurring. If employees claim they weren't trained on something, and it is documented, the company can produce the documentation and that resolves the issue." *Id.* at PageID 287. Callahan gave Bender "wrong files or versions of files on many occasions," so Bender could not trust Callahan to give her accurate information. *Id.* Callahan also would sometimes not give Bender files to work on and instead keep the files herself. Once, when Callahan gave Bender a file, it turned out there was something wrong with the file that Bender claimed Callahan had "covered up." *Id.* at PageID 288. Bender had to work through the weekend to fix the issue. According to Bender, Callahan was competitive with Bender and the other writers because they had more technical writing experience than Callahan had, which created "a conflict of interest." *Id.* at PageID 291. "So maybe she fe[lt] insecure and th[ought] that if she d[idn't] give us any information when she's supposed to be training us, then we c[ouldn't] do more than she does." *Id.* at PageID 288. Bender also wrote that

Callahan "was worried that I would look better than her because she didn't know" how to do certain tasks. *Id.* at PageID 288–89.

Bender also wrote in the December 14, 2016 email that printing problems had occurred in the past week. Bender stated that she had tried to print copies of a manual but "discovered that the printer was printing black streaks all over the manuals." *Id*. at PageID 289. When she showed this to Callahan, Callahan told Bender to continue printing and that the printer would be fixed the next week. In Bender's email, she claimed that she did not "feel comfortable sending manuals with black streaks to the FAA or to all the pilots." *Id.* When she had sent an email to Conrad and Lofting about the issue, Bender recounted, the printer had been fixed the same day.

According to Bender's December 14 email, the day after the printer episode Callahan asked Bender to remove change bars from the manual. Change bars are notations on a page indicating to the reader what was updated from the previous version of the manual. Bender claimed that she had been working with change bars "for months" and had never omitted them. *Id*. In her email, Bender did not state that Callahan's directions about the change bars resulted in a safety issue.

The next day, December 15, Hewitt and Conrad met with Bender, and Hewitt told her that she must comply with Callahan's directives about printing manuals. Still, Bender persisted with her criticisms of Callahan. On December 19, 2016, Bender sent an email to Laura Prince, the Managing Director of Human Resources, stating that she was concerned because Hewitt had told her she should have continued printing the manuals as Callahan instructed. She wrote that "[t]he black bars were very bad and printed randomly through the text and could have covered critical information that the pilots needed, which could possibly result in a plane crash." *Id.* at PageID 292. However, despite flagging this potential safety issue resulting from printing the manual with black streaks, Bender admitted in her deposition that she had printed only three pages of the manual before the printer was fixed.

Early the next month (January 2017), Callahan learned that Bender was still making negative comments about her. Callahan decided to go to Hewitt about it. Hewitt then spoke with Nenadovic and Nick Wolf, a graphic designer who worked in the Tech Pubs office, and they both confirmed that Bender continued to disparage Callahan. For instance, according to Nenadovic, Bender told him that Callahan was "too young and incompetent to run the department" and was spying on the employees. R. 27-6, PageID 347–48. Nenadovic also reported that Bender called Callahan a "brat." R. 27-3, PageID 307. (Bender disputes that she made these remarks.)

On January 4, 2017, Bender sent an email to Prince and Daniels again contending that Callahan's new change-bar format caused excessive work, that Callahan did not know how to use the operative software, and that Callahan wrongly blamed Bender for errors. Bender did not refer to any safety issues in this communication.

The January 4, 2017 email proved to be the final straw. Soon afterwards, Prince and Daniels met with Bender and firmly stated (according to Bender) that Callahan "is the manager, she is remaining manager, and we are not going to do anything about it." *Id.* at PageID 266. Bender then "volunteer[ed] to get laid off" because she could not work with Callahan. *Id.*

Prince followed up by emailing Bender a letter on January 6, 2017, stating that her "employment with our Company will terminate at the close of business of January 9, 2017 due to mutual agreement." *Id.* at PageID 297. On January 7, Bender responded to Prince's letter, "I gave it some thought over the weekend and I haven't decided that I want to quit the job at CommutAir." *Id.* at PageID 298. Instead, Bender stated that she wanted additional time to consult with an attorney.

On January 11, 2017, Bender returned to work, where a Record of Instruction and Action awaited her. The Record granted her permission to return from administrative leave "provided that she refrains from disparaging remarks about her supervisor." *Id.* at 299. But, the Record

6

warned Bender that failure to follow its non-disparagement directive would result in disciplinary action, including termination. *Id.* at 299. Bender signed the Record but attached a letter stating that the Record was "retaliatory because I accused my boss Joan Callahan of what amounts to neglect of duty." *Id.* at 301. Bender did not raise any safety issue in this response.

Eight days later, on January 19, 2017, however, Bender sent an email to Conrad, Lofting, and John Darke, the Director of Safety, entitled "Possible Safety Concern." *Id.* at 302. The email reiterated the change-bars issue raised in the December emails, and Bender also attached a video she had created so that Darke could "look at [it] and determine if it is a safety concern." *Id.* Bender stated that she did not "want it on my conscience if the pilots [were] looking through" the manuals for changes and did not see them. *Id.*

On January 30, 2017, Prince held a routine meeting with Josephine Monyak, CommutAir's Corporate Communications Specialist, who "worked in the same work area" as Bender. R. 27-5, PageID 343. Prince asked Monyak "how things were going," and Monyak responded by telling Prince that Bender had been complaining about Callahan. *Id.* at PageID 342. In a follow-up email to Prince, Monyak wrote that Bender had said she liked Callahan "as a person, but not as a boss," because Callahan had not properly trained her. R. 27-9, PageID 359. According to Prince's deposition and Nenadovic's affidavit, Prince also contacted Nenadovic to see if Bender had continued making comments about Callahan to other co-workers and learned that Bender's complaints about Callahan had increased.

On February 1, 2017, Prince and Daniels gave Bender a letter terminating her employment for failure to "refrain from disparaging remarks about [her] supervisor." R. 27-2, PageID 304. A little over six months later, on August 16, 2017, Bender filed a complaint against CommutAir in the Cuyahoga County Court of Common Pleas seeking damages for alleged wrongful discharge in violation of public policy. After CommutAir removed the case to federal court, the district court

7

granted the company's motion for summary judgment on October 9, 2018. The court held that Bender did not provide sufficient evidence to allege a violation of Ohio public policy. On November 7, 2018, Bender timely filed this appeal.

## II.

We review de novo the district court's grant of summary judgment, *see Domingo v. Kowalski*, 810 F.3d 403, 410 (6th Cir. 2016), viewing the evidence in the light most favorable to Bender, the nonmovant, *see Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013). Summary judgment is appropriate if "the movant," CommutAir, "shows that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Ohio law provides that an at-will employee, which Bender was, generally has no guarantee of continued employment. *See Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 828–29 (Ohio 2011). There is, however, a "public policy" exception to the employment-at-will doctrine. *Id.* at 829. To establish a claim for wrongful termination in violation of Ohio public policy, a plaintiff must show: (1) that "a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element)"; (2) that dismissal "under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element)"; (3) that "the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element)"; and (4) lack of an "overriding legitimate business justification for the dismissal (the overriding justification element)." *Collins v. Rizkana*, 652 N.E.2d 653, 657–58 (Ohio 1995) (emphases omitted). The clarity and jeopardy elements present questions of law, while the causation and overriding justification elements present questions of fact. *Id.*

Before the district court, Bender argued that CommutAir discharged her in violation of public policy because 14 C.F.R. § 121.135, a federal regulation entitled "Manual contents" (the "Manual Contents regulation"), lays out various requirements that aircraft manuals must contain, and Bender formally complained about Callahan engaging in manual-editing processes that could cause a safety issue.

The Manual Contents regulation states that an aircraft manual must:

(1)     Include instructions and information necessary to allow the personnel concerned to perform their duties and responsibilities with a high degree of safety;

(2)     Be in a form that is easy to revise;

(3)     Have the date of last revision on each page concerned; and

(4)     Not be contrary to any applicable Federal regulation and, in the case of a flag or supplemental operation, any applicable foreign regulation, or the certificate holder's operations specifications or operating certificate.

14 C.F.R. § 121.135(a). Under the regulation, a manual must also include specific information concerning things such as the duties and responsibilities of each crewmember, procedures for continuance of flight if any item of equipment becomes inoperative, landing weight limitations, and emergency equipment and procedures, among other things. *Id.* § 121.135(b) A copy of the manual must be maintained at the base of operations. *Id.* § 121.135(c).

On appeal, Bender argues that the Manual Contents regulation manifests a clear public policy bearing on safety and that her dismissal after she complained about safety jeopardized that public policy. The parties dispute the standard under Ohio law for whether a policy satisfies the clarity element of the statute, but we need not decide what the proper standard is. That is because, even assuming that the Manual Contents regulation manifests a "clear public policy" in favor of protecting employees who raise safety issues based on potential regulatory violations, *see Miracle v Ohio Dep't of Veterans' Servs.*, __N.E.3d__, __, No. 2018-0562, 2019 WL 3916283, at *3 (Ohio Aug. 20, 2019), that public policy was not jeopardized by Bender's dismissal. Therefore, Bender

cannot establish the second element of her claim and the public-policy exception does not apply to her.

In addressing the jeopardy element, we have applied a three-factor analysis:

(1) [D]etermine "what kind of conduct is necessary to further the public policy" at issue; (2) decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal.

*Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003) (citation omitted). A plaintiff need not "be certain that the seemingly inappropriate conduct is actually illegal" for his actions to fall within the scope of conduct protected by this policy. *Id.* at 600. "Rather, an employee simply must have had a 'good faith belief that [his] complaint was valid' at the time of his complaint." *Id.* (alteration in original) (quoting *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 324 (Ohio 1997)).

In addition to making a good-faith complaint, to receive the protection of the public policy, an employee must also "give the employer clear notice that the employee's complaint is connected to a governmental policy. It must be sufficiently clear from the employee's statements that he is invoking governmental policy that a reasonable employer would understand that the employee relies on the policy as the basis for his complaint." *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 656 (6th Cir. 2005). This is so because whistleblowing employees act as "de facto 'enforcers' of [public] policies." *Id.* at 659. Employers receive notice when actual government enforcers inspect their conduct. *Id.* So too, when an employee makes a complaint, "employers must receive notice that they are no longer dealing solely with an at-will employee, but with someone who is vindicating a governmental policy." *Id.* The plaintiff bears the burden of establishing that she provided clear notice; otherwise her claim fails as a matter of law. *See O'Connor v. Nationwide Children's Hosp.*, 723 F. App'x 321, 323 (6th Cir. 2018) (holding that a

complaint failed to state a claim under Fed. R. Civ. P. 12(b)(6) because the plaintiff "pleads no facts indicating that she gave NCH 'clear notice' of her intent to vindicate a governmental policy favoring workplace safety vis-à-vis her workers' compensation claim").

We have held that an employee has not given clear notice that she is acting to protect public policy if her employer could reasonably see an alternative basis for her complaints. *See Trout v. FirstEnergy Generation Corp.*, 339 F. App'x 560, 568 (6th Cir. 2009) (holding that the plaintiff did not provide clear notice, even though she expressly framed her complaint as a concern about safety hazards, because her employer "could have reasonably viewed her report as a defense of her work product"); *Avery v. Joint Twp. Dist. Mem'l Hosp.*, 286 F. App'x 256, 265 (6th Cir. 2008) (holding that the plaintiff did not provide clear notice because her "statements could be seen by the Hospital as a defense of her performance and not as a report of the violation of a government policy").

Under the standards we articulated in prior cases, Bender fails to satisfy the jeopardy element because the facts, when viewed in the light most favorable to her, establish that she did not provide CommutAir with clear notice that the governmental policies underlying 14 C.F.R. § 121.135 served as the basis for her complaints. Bender contends that during her employment she reported that black streaks printed on the manuals and the process used for removing change bars could jeopardize pilot safety. Although she did complain about both matters, she did not initially raise either of them as safety concerns specifically. Instead, she reported them in the course of a larger series of complaints about Callahan's competence as a supervisor. She also did so in response to accusations that she was behaving inappropriately toward Callahan. CommutAir could have reasonably interpreted Bender's complaints as stating her individual grievances against Callahan and justifying her own actions towards her, rather than as invoking governmental interests. Bender's complaints therefore do not fall within the scope of conduct protected by public

policy, and she fails to satisfy the jeopardy element. *See Trout*, 339 F. App'x at 568; *Avery*, 286 F. App'x at 265. We address her complaints in more detail below.

*Black streaks from the printer malfunction.* Bender raised the issue of the printer malfunction in her emails of December 8, 14, and 19. She plausibly raised the issue of safety only in the latter two. In both of those instances, CommutAir could reasonably have interpreted her complaints as an effort to defend her actions by criticizing Callahan, rather than as clear notice that she was vindicating public policy.

Bender mentioned the printer malfunction in passing in her December 8 email. R. 27-2, PageID 285. She said only that the printer "needed cleaned [sic] and was jamming." *Id.* She did not mention the black streaks or any potential safety issue at the time. The mere acknowledgement that a problem exists cannot provide clear notice to an employer that an employee is invoking public policy. *See Jermer*, 395 F.3d at 659 (holding that the statement "I still think there's issues" with the air quality was insufficient to provide clear notice).

Although Bender's December 14 email at least hinted at safety concerns, it still did not provide CommutAir with clear notice that she was invoking public policy. The email primarily concerned her disagreements with Callahan, not safety. The statement "I didn't feel comfortable sending manuals with black streaks to the FAA or to all the pilots" at least gestures toward safety. R. 27-2, PageID 289. In context, however, this statement did not provide clear notice that Bender was invoking public policy. Rather than raise the issue of safety when she first mentioned the malfunction in her December 8 email, Bender only mentioned the black streaks after Hewitt accused her of behaving inappropriately toward Callahan during their December 9 meeting. CommutAir therefore could have reasonably viewed Bender's report as a defense of her conduct by pointing to other inappropriate acts by Callahan.

Bender's December 14 email speaks to pilot safety, but in context it still fails to provide CommutAir with clear notice. After Hewitt responded to Bender's complaints by directing her to follow Callahan's instructions, Bender repeated one of the same complaints against Callahan to Hewitt's superior in Human Resources five days later. CommutAir could reasonably interpret this action as a further attempt to vindicate herself after Hewitt effectively sided with Callahan over her.

The fact that the black bars were no longer a live safety issue on December 19—or even on December 14—provides further support for the interpretation that Bender's complaints were not motivated by public policy. By Bender's admission, Callahan had the printer fixed the day Bender noticed the problem, *id.* at PageID 289, and Bender had printed only three pages of the manual before the printer was fixed, *id.* at PageID 262. In her email to Prince, Bender did not present the printer malfunction as a problem currently causing danger or likely to recur and cause danger in the future. She did not ask Prince how to handle any ongoing safety problems; instead she asked Prince whether it was right for Hewitt to tell her to follow Callahan's instructions. Since Bender did not even purport to identify an actually existing safety risk, CommutAir had all the more reason to conclude that Bender was primarily acting to justify her actions toward Callahan, rather than to vindicate a public policy interest. The undisputed facts therefore show that Bender's complaints about the black streaks did not provide CommutAir with clear notice.

*Change bars.* Bender complained about the method for removing change bars in her December 8, December 14, and January 4 emails without ever mentioning the problem as potentially raising a safety concern or otherwise connecting her complaints to governmental policy. In those emails Bender consistently blamed Callahan for failing to properly train her on how to remove change bars and for other perceived deficiencies in her performance. Bender then offered to quit because she could no longer work under Callahan, signed the Record requiring her

to refrain from making disparaging remarks about Callahan, and then claimed the Record was retaliatory because she had accused Callahan of "neglect of duty." Only after these events had transpired did Bender connect her complaints about the change bars to the issue of safety in her January 19 email. As in her prior emails, she blamed Callahan for messing up the change bars and for failing to listen to her concerns. Given this history, CommutAir could reasonably have interpreted Bender's January 19 email as a continuation of her personal grievances against Callahan rather than as a clear notice that she was vindicating public policy. CommutAir could also have reasonably questioned the good faith of Bender's complaint since she only framed her complaint as a safety concern after she had made clear that she was contemplating pursuing a claim that CommutAir had acted against her in retaliation. The undisputed facts therefore show that Bender's complaints about the change bars did not provide CommutAir with clear notice either.

**III.**

There is no dispute that Bender continuously criticized Callahan's job performance for over a year before she made the complaints on which she now relies, that she first made framed these complaints not as safety issues but as criticisms of Callahan's performance, that her superiors did not agree with her criticisms of Callahan, that her superiors also questioned the appropriateness of her conduct toward Callahan, and that only after Bender's conduct toward Callahan was questioned did she reframe her complaints against Callahan as safety concerns. Bender therefore fails as a matter of law to establish clear notice, meaning that she does not satisfy the jeopardy element of her wrongful-termination claim. Because a reasonable jury could not find that Bender was wrongfully terminated under Ohio law, we **AFFIRM** the district court's grant of summary judgment to CommutAir.

14

**HELENE N. WHITE, Circuit Judge (dissenting).** I respectfully dissent. Although the majority accurately observes that Bender did not identify many of her complaints as concerning safety, there is ample evidence that the complaints immediately preceding her discharge were so identified and did meet the requirements of *Himmel v. Ford Motor Co.*, 342 F.3d 593 (6th Cir. 2003), and *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655 (6th Cir. 2005), on which the majority relies. And, although the evidence produced on summary judgment could support a finding that Bender was not fired in retaliation for her safety complaints, but rather, for her persistent complaints about Callahan that were not necessary to further her safety complaints, there is also evidence supporting a contrary finding. Accordingly, I conclude that summary judgment was improper, and would reverse and remand for further proceedings.

CommutAir's Vice-President and Director of Operations, Justin Conrad, acknowledged that Bender had complained to the Safety Department and several company officials that the black bars in the manuals and the process used for change-bars could jeopardize pilot safety. Conrad testified at deposition regarding Bender's December 19, 2016 email to Managing Director of Human Resources Laura Prince, in which Bender stated that she had shared a concern with David Hewitt of the Employee Relations Department that Callahan was telling her to print manuals for the FAA when "[t]he black bars were very bad and printed randomly through the text [and] could have covered critical information that the pilots needed, which possibly could result in a plane crash." R. 27-2, PID 292. Bender's email to Prince stated that Hewitt "told me I should just do whatever my Supervisor tells me, regardless of what I think." *Id.* Bender asks Prince in the email, "What is the proper action that I should take in a situation like this—when my Supervisor asks me to do something that goes against my con[science]—should I send an anonymous email to the Safety Department and let them check into it. I didn't want to be responsible for a plane crash because a pilot couldn't read a critical line of information in a manual while flying an airplane."

*Id.* Bender's counsel asked Conrad, "Based on the information in this email, would you agree with me that my client's making a report about a safety problem?" R. 30, Ex. 2 at 45. Conrad responded, "She's attempting to make a safety claim to the employee relations person. She should be making that through the Safety Department if that's what she's doing." *Id.* Bender's counsel then asked, "Do you know if my client ever made complaints about safety issues to the Safety Department at the company?" and Conrad responded, "Yes, I am aware that she made . . . [c]hange bar complaints specifically . . . she thought the company was doing it incorrectly, that she had a better way, say, safer way, and that we disregarded her concern related to a change bar." *Id.* at 45-46. Bender's counsel asked whether Bender's complaint was investigated, to which Conrad responded, "Director of safety pushed this to the Safety Action Group, asked them to investigate, and they did with no finding . . . mean[ing] that there was not a safety risk . . . . That a change did not need to be implemented." *Id.* at 46.

The majority's determination that Bender's statement that the black bars "could have covered critical information that the pilots needed, which could possibly result in a plane crash," did not provide CommutAir with clear notice is perplexing. The statement clearly refers to a safety concern and the basis for it. To provide clear notice, "an employee need not cite a specific statute or law." *Jermer*, 395 F.3d at 659. Further, "no Ohio law suggests that, at the time of [her] complaint, an employee must be certain that the seemingly inappropriate conduct is actually illegal." *Himmel*, 342 F.3d at 600 (citing *Fox v. City of Bowling Green*, 668 N.E.2d 898, 902 (Ohio 1996)).

For the same reason, I disagree with the majority's assertion that Bender's reference to a "possible safety concern" regarding change bars did not provide CommutAir with clear notice.

Bender's complaints regarding properly adding or deleting single change bars[1] could not have been clearer in communicating that she was concerned with airline and pilot safety, specifically the ability of pilots to recognize that provisions in the manual have been changed; it is imperative that pilots know when information has been changed or updated, *see* 14 C.F.R. § 121.135(1) (stating that an aircraft manual must "[i]nclude instructions and information necessary to allow the personnel concerned to perform their duties and responsibilities with a high degree of safety").

Relying on two unpublished cases, *Trout v. FirstEnergy Generation Corp.*, 339 F. App'x 560 (6th Cir. 2009) and *Avery v. Joint Twp. Dist. Mem'l Hosp.*, 286 F. App'x 256 (6th Cir. 2008), the majority concludes that Bender cannot satisfy the clear notice requirement because CommutAir could reasonably have interpreted Bender's safety complaints as "a continuation of her personal grievances against Callahan rather than as a clear notice that she was vindicating public policy." Maj. Op. at 14. I disagree for several reasons. First, although these unpublished cases used language focusing on the employers' reasonable interpretation of the employees' statements

---

[1] Bender's email to Safety Director John Darke, Vice President and Director of Operations Conrad, and Assistant Director of Operations Jake Lofting, entitled "Possible Safety Concern," stated in pertinent part:

> Due to a possible safety concern that I wanted John Darke to look at and determine if it is a safety concern, I made a little Adobe Captivate video very quickly last night to illustrate the safety concern. . . .
>
> ***
>
> Thus, watch the enclosed video on Disappearing Change Bars. This is the Aircraft Operations Manual. I don't want it on my conscience if the pilots are looking through the 600+ page E145 AOM for the changes and they don't see them all because the change bars disappeared out of the file because they are tied to paragraph tags.
>
> I'm letting John Darke determine if that is a safety risk. We do have a safe, correct way to add/delete single change bars that I found for us where they will never disappear unless we purposely take them out. I tried informing Joan about this and she ignored it. You three are pilots and can determine if this is a safety risk . . . .

R. 29-3, PID 439-40.

alleged to have invoked public policy, *Jermer*, on which the two cases and the majority rely, does not speak in these terms. *Jermer* does not suggest that because Bender had a history of criticizing Callahan, any future safety concerns she might raise, no matter how clear, could be treated by CommutAir as a continuation of those disputes and would therefore lack protection. Second, the facts here are distinguishable from those in *Trout* and *Avery*. In both cases, the employee made a complaint in direct response to a supervisor's criticism. In *Trout*, the employee made her complaint while being confronted by a supervisor about tardiness during a work performance evaluation. 339 F. App'x at 562. In *Avery*, the employee made her complaints while being confronted by her supervisor about several performance-related concerns. 286 F. App'x at 265. Unlike the plaintiffs in *Trout* and *Avery*, Bender did not sit on her complaints until she was called in for a performance review; Bender was not directly responding to a supervisor's criticism; and Bender went out of her way to initiate the communications and convey her safety concerns to Callahan's supervisors and to CommutAir's director of safety. Although Bender's prior disputes with Callahan were no doubt on the minds of those supervisors, Bender articulated her safety concerns and invoked government policy as clearly as could reasonably be expected. Third, Conrad's testimony discussed above supports that Bender's final communications were understood as raising safety concerns, and not simply as challenging Callahan's management abilities. Thus, as a factual matter, the majority's extension of *Jermer* is questionable.

I would reverse the district court's dismissal of Bender's public-policy wrongful-termination claim and remand for further proceedings.