**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0524n.06

**No. 08-4119**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jul 30, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| TERESA TROUT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| FIRSTENERGY GENERATION CORP. | ) | |
| and FIRSTENERGY CORP., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: MERRITT, GRIFFIN, and KETHLEDGE, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Teresa Trout sued her former employer, FirstEnergy Corporation,[1] claiming that she was unlawfully terminated because of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e-16, and Ohio Rev. Code § 4112.02, and for reporting a workplace safety hazard in violation of Ohio public policy. Trout appeals the district court's grant of summary judgment and its award of compensatory damages to FirstEnergy on its counter-claim for relocation expenses. We affirm.

I.

---

[1]We refer to defendants-appellees, FirstEnergy Generation Corp. and FirstEnergy Corp., collectively as FirstEnergy.

Trout worked as a yard specialist at FirstEnergy's Bayshore Plant in Oregon, Ohio, from December 7, 2005, until her termination on February 10, 2006.[2] FirstEnergy and its subsidiaries and affiliates are involved in the generation, transmission, and distribution of electricity, as well as energy management and other energy-related services. Because many of its employees work with electricity, they are trained in workplace safety and must attend numerous safety meetings.

On January 11, 2006, Trout arrived late for a mandatory safety meeting. She did not realize that her attendance was required until that day, when she arrived at work and noticed the meeting's details posted on the company's bulletin board. Trout's supervisor, Terry Konz, spoke to her about her late arrival, but he did not discipline her at that time. On January 18, 2006, Trout arrived thirteen minutes late for her shift. She did not notify a supervisor that she would arrive late because she did not want to use her cell phone while driving in hazardous weather conditions.

On January 20, 2006, Trout observed several co-workers assembling a trailer-mounted vacuum machine without grounding it, a safety measure necessary to prevent the build-up of static electricity during the vacuum's operation. At that time, a co-worker informed Trout that it was important for employees to ground the machine for safety purposes. She did not report her observation because her co-workers were merely setting up the machine, and she assumed that they would ground it before using it.

_____

[2]According to the collective bargaining agreement, FirstEnergy classifies yard specialists as probationary employees during their first year of employment. These employees are subject to termination at its discretion.

On February 2, 2006, Trout's immediate supervisor, Jim Knapinski, asked Trout to use the vacuum to perform cleanup work. She informed him that she had not yet completed her training on the equipment. Knapinski told her that she would be working with another employee, John Noll, who was familiar with the machine. When Trout began vacuuming, she presumed that Noll had grounded it because Knapinski said that Noll was trained. When she finished using it, however, Trout discovered that Noll had not grounded the vacuum.

The next day, Trout met with Terry Konz, a supervisor of yard operations, for a work performance evaluation. The written evaluation reported that Trout's performance "need[ed] improvement." The report also noted that Trout was late to work. At the conclusion of her evaluation, Mr. Konz asked Trout whether she had any concerns or issues she wanted to discuss. At that time, Trout informed Konz that she believed her co-workers were not grounding the vacuum machine, creating a safety hazard. Trout had not reported the failure-to-ground issue the previous day or before her meeting with Konz because she believed "the machine would not be used by other employees on the morning/early afternoon shift of February 3, 2006."

On February 10, 2006, one week after her performance evaluation, FirstEnergy fired Trout, stating that she had violated company policy regarding tardiness and her duty to timely report safety concerns.

Thereafter, Trout filed a four-count complaint against FirstEnergy in the United States District Court for the Northern District of Ohio, alleging, inter alia, sex discrimination in violation of Title VII of the Civil Rights Act and Ohio Rev. Code § 4112.02, and wrongful termination in

violation of public policy under Ohio law. Trout sought compensatory and punitive damages in the amount of $4,000,000. FirstEnergy filed a counter-claim, seeking $7,597.45 in damages related to Trout's failure to reimburse FirstEnergy for relocation expenses paid under the parties' Relocation Repayment Agreement.

After extensive discovery, FirstEnergy moved for summary judgment. The district court granted its motion, ruling that Trout did not establish a prima facie case of sex discrimination because she failed to identify a similarly-situated male co-worker "[w]ho had all three of the failings that she had." The district court further held that Trout's wrongful termination claim based on Ohio law failed because she could not establish the "jeopardy" element, which requires an employee to provide clear notice that she is invoking a governmental policy when reporting a safety hazard. Finally, the district court ruled that FirstEnergy was entitled to $7,597.45 in compensatory damages pursuant to its counter-claim for reimbursement of Trout's relocation expenses.

II.

We review de novo the district court's grant of summary judgment. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 374 (6th Cir. 2007). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Thus, only disputed material facts, those "that might affect the outcome of the suit under the governing law[,]" will defeat summary disposition. *Id.* at 248. Once the movant has met its burden, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos. Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). When determining whether the nonmovant has met this burden, we must view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

Because Trout does not proffer direct evidence of sex discrimination, we must determine whether she presented sufficient circumstantial evidence to overcome FirstEnergy's motion for summary judgment. Both parties agree that our analysis is governed by the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Under that analysis, a plaintiff must first establish a prima facie case of unlawful discrimination. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). To establish a prima facie case of sex discrimination, Trout is required to show that: "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or, [a] similarly

situated non-protected employee [] [was] treated more favorably." *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). "Because the prima facie case requirements are essentially the same under Ohio Revised Code § 4112.02, [Trout's] federal and state-law claims of [sex] discrimination may be [analyzed] together." *Gettings v. Bldg. Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir. 2003) (internal citation omitted).

Once the plaintiff has made her prima facie showing, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory basis for the adverse employment action. *Wright,* 455 F.3d at 706. This explanation "must be legally sufficient to justify a judgment for the defendant." *Id.* (quoting *Burdine*, 450 U.S. at 255). If the defendant meets its burden, the plaintiff must show that the proffered reason was actually a pretext for unlawful discrimination. *Wright,* 455 F.3d at 706-07. "Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Id.* at 707 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

A.

Only the district court's ruling regarding the fourth prong of Trout's prima facie case is at issue in this appeal. Trout argues that the district court erred "because a jury could conclude that other male probationary employees were similarly situated to [her] but were treated more leniently." Specifically, she asserts that two male probationary employees – Gabe Sprague and Mark Hill – were more tardy than she – and that, in addition to their tardiness, these men did not report the failure-to-

ground vacuum hazard. Thus, Trout argues, FirstEnergy unlawfully held her to a stricter standard because of her sex.

"In employment discrimination cases, the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated;' rather, [we] ha[ve] held that the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 458 (6th Cir. 2004). Thus, to establish a prima facie case, Trout must identify at least one similar, non-protected employee guilty of conduct of "comparable seriousness" to the conduct for which she was fired but whom management treated more leniently. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Thus, we must decide whether Sprague or Hill's conduct was of "comparable seriousness" to Trout's conduct.

As a preliminary matter, Trout has offered no evidence to support her contention that Sprague or Hill had knowledge of the failure-to-ground hazard.[3] In addition, neither Sprague nor Hill arrived late to the January 11, 2006, mandatory safety meeting, and there is no evidence that these men received unfavorable work performance evaluations, i.e., an overall rating of "needs improvement," during their first three months of employment.

---

[3]Throughout briefing and oral argument in this case, Trout argued that "Hill and/or Sprague would likely have observed [the failure-to-ground hazard] at some time or other, whether or not they personally grounded the machine when they used it." While this could be true, Trout was presumably capable of deposing Hill or Sprague to support her conjecture, but she failed to do so. Instead, she seeks us to infer that both Hill and Sprague witnessed the safety hazard and failed to report it. This is too tenuous an inference to accept, especially where we must compare employee conduct and analyze whether we can infer discriminatory intent based on circumstantial evidence.

Specifically, Gabe Sprague's tardy incident occurred in April 2006, more than two months after Trout was fired and almost six months after he began his employment with FirstEnergy. Although Trout argues that the extent of Sprague's tardiness, approximately ninety minutes, demonstrates "comparable seriousness," FirstEnergy argues that an employee's late arrival during the first three months of employment raises more "red flags" than an employee's late arrival after six months of employment. In short, the six-month employee has a better track record of punctuality and performance than the three-month employee. *Id.* (holding that differentiating or mitigating circumstances must be considered when seeking to compare employee conduct or the employer's treatment of it). We agree. Moreover, Trout was tardy two times within seven days.[4] In contrast, Sprague went twice as long without being late and did not commit a second infraction within a seven-day period.

Mark Hill was an hour late for his shift on February 2, 2006. While we acknowledge that this incident occurred within his first three months of employment, similar to Trout's tardiness on January 18, 2006, and that Hill was forty-five minutes later than Trout, this is where the similarities end. Hill was not late for the January 11, 2006, mandatory safety meeting, nor is there evidence suggesting that he was late twice, or that he committed a second comparable infraction during the

---

[4]FirstEnergy contends that Trout missed the entire safety meeting. Trout claims that she arrived ten to fifteen minutes late for the meeting. Because we must construe the facts in the light most favorable to the nonmoving party, we assume, as the district court did, that she arrived late for the meeting. Notwithstanding this assumption, we note that Trout signed a work performance evaluation acknowledging that she "showed up at 14:30[,] [when] the safety meeting was scheduled to start at 14:00[.]"

same week. In addition, he did not receive an overall work performance evaluation of "needs improvement" during his first three months of employment.

We therefore agree with the district court's ruling and hold that Trout failed to establish a prima facie case of sex discrimination because she did not demonstrate that her employer treated a similarly situated male employee more leniently.

This leads to Trout's somewhat convoluted "unreasonable delay" argument. Specifically, Trout asserts that the district court erred because it "did not explain the factual basis for its finding that [she] had failed to *timely* report a dangerous condition." When Trout was deposed, she testified that she first observed the hazard on or around January 20, 2006, while she was speaking with a co-worker and watching other co-workers assemble the vacuum. When FirstEnergy moved for summary judgment, it claimed that Trout's two-week delay in reporting the dangerous condition was unacceptable in light of its policy requiring that all employees immediately report safety hazards.

Trout, however, "corrected" that segment of her deposition testimony pursuant to Fed. R. Civ. P. 30(e). Rule 30(e) allows a witness to "review the [deposition] transcript" for "changes in form or substance" and "sign a statement listing the changes and the reasons for making them." *Id.* Trout did so, noting that "[y]es, I did see the machine not grounded at that time [but] did not remember the machine was not actually doing any work at the time." Thus, according to Trout, she was not required to report the ungrounded vacuum on January 20, 2006, and her report was not untimely because she notified FirstEnergy of the hazard on February 3, 2006, one day after she witnessed it.

FirstEnergy responds that Trout is not entitled to benefit from her corrected deposition testimony because her counsel did not rehabilitate her statements during the deposition. As FirstEnergy points out, "Rule 30(e) does not allow one to alter what was said under oath." *Tuttle v. Tyco Elecs. Installation Servs., Inc.,* No. 2:06-cv-581, 2008 WL 343178, at *4 (S.D. Ohio Feb. 7, 2008). "If that were the case, one could merely answer the questions with no thought at all[], then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination." *Id.* (citation omitted).

In addition, Trout filed two affidavits in conjunction with her opposition to FirstEnergy's motion for summary judgment "clarifying" her deposition testimony about when she first witnessed the failure-to-ground hazard. Specifically, these affidavits state that she did not report the hazard on January 20, 2006, because "the machine was not yet actually being used, and I assumed that it would be grounded when anyone used it."

Trout's arguments are misplaced for several reasons. First, the district court gave Trout the benefit of her corrected deposition testimony. Specifically, in its summary of undisputed facts, it concluded that Trout "failed to report *timely* [the] safety concern of which [she] was aware." (Emphasis added.) More importantly, a plaintiff may not create a factual issue by filing an affidavit that contradicts her earlier deposition testimony. *Kelso v. City of Toledo*, 77 F. App'x 826, 834 (6th Cir. 2003) (unpublished) (citing *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986)); *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984) (holding that a plaintiff could not create a factual issue by filing an affidavit that contradicted its earlier deposition testimony after the

defendants moved for summary judgment). The rationale for this rule is simple, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting h[er] own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Reid*, 790 F.2d at 460 (citation omitted).

Nonetheless, assuming arguendo that Trout first became aware of her obligation to report the failure-to-ground hazard on February 2, 2006, her next-day report was still untimely. According to Greg Dusseau, FirstEnergy's union representative, all employees who witness a safety hazard must "immediately report th[e] [safety] concern to their supervisor." Trout offers no evidence to rebut the accuracy of Dusseau's statement about the company's reporting policy. Thus, even in the light most favorable to Trout, because she did not immediately report the hazard, she failed to timely report it.

For these reasons, the district court did not err in ruling that Trout failed to establish her prima facie case of sex discrimination.

## B.

Next, Trout claims that FirstEnergy fired her in violation of Ohio public policy, which protects employees from termination when reporting safety hazards to their employers. Trout argues that the district court improperly applied federal law to a state-law issue when it dismissed her claim.

The Supreme Court of Ohio first recognized common law claims of wrongful discharge in violation of Ohio public policy in *Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990). We have previously noted that "'public policy' [claims] may arise from a number of

sources including the federal and Ohio Constitutions, statutory law, administrative rules or the

common law . . . ." *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 655-56 (6th Cir.

2005). The elements necessary to establish a claim for wrongful termination in violation of Ohio

public policy are:

> 1) That [a] clear public policy existed and was manifested in a state or federal
> constitution, statute or administrative regulation, or in the common law (the *clarity*
> element)[;] 2) That dismissing employees under circumstances like those involved
> in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy*
> element)[;] 3) The plaintiff's dismissal was motivated by conduct related to the
> public policy (the *causation* element)[;] 4) The employer lacked overriding legitimate
> business justification for the dismissal (the *overriding justification* element).

*Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995). The second prong, referred to as the

"jeopardy element," is contested here and is a question of law. *Id.* at 658. In *Jermer*, we discussed

the jeopardy element in detail, stating:

> Our interpretation of this gateway element is as follows: although complaining
> employees do not have to be certain that the employer's conduct is illegal or cite a
> particular law that the employer has broken, the employee *must at least give the
> employer clear notice that the employee's complaint is connected to a governmental
> policy*. It must be sufficiently clear from the employee's statements that he is
> invoking governmental policy that a reasonable employer would understand that the
> employee relies on the policy as the basis for his complaint.

395 F.3d at 656 (emphasis added). Trout does not argue that she provided "clear notice" when she

made her report. Instead, she argues that a recent Ohio appellate court case discredits *Jermer's*

interpretation of the jeopardy element:

> We disagree with *Jermer*'s implication that an employee must make some formal
> announcement that his statements are being made for the purpose of protecting the
> public policy favoring workplace-safety. Employers are presumed to be sophisticated
> enough to comply with the workplace safety laws. When an employer directs

employees to not speak to an insurance representative inspecting a premises, an implication arises that the employer wishes to cover up defects, including those that create a danger to employees. Supporting the employer's conduct endorses its efforts to conceal potential dangers. As *Jermer* recognized, the Supreme Court views employee complaints as critical to the enforcement of the state's public policy. We would be minimizing the importance of these complaints and the state's public policy were we to concentrate on the employee's intent in raising the safety concern rather than on whether the employee's complaints related to the public policy and whether the employer fired the employee for raising the concern.

*Dohme v. Eurand Am., Inc.*, 868 N.E.2d 701, 707 (Ohio Ct. App. 2007), *vacated*, 903 N.E.2d 1174 (Ohio 2009). The *Dohme* decision, however, was vacated by the Supreme Court of Ohio one month after the parties filed their briefs in the present case. Thus, we cannot consider *Dohme* because it is no longer precedent.

However, even if we were to adopt *Dohme's* reasoning here, the context of Trout's report undercuts the merits of her public policy argument. As the district court noted:

Trout, rather than immediately informing her supervisors about the vacuum's improper grounding waited until FirstEnergy had given her a less than favorable review. Accordingly, FirstEnergy could view Trout's statements as a defense of her performance, rather than a report of a government policy's violation.

In *Avery v. Joint Twp. Dist. Mem'l Hosp.*, we found that a plaintiff failed to satisfy the jeopardy element for precisely this reason, stating:

[Plaintiff's] discussion of [her co-worker's] falsification of records similarly does not satisfy the jeopardy requirement. [Plaintiff] made statements regarding the inaccuracy of [her co-worker's] account of the November 5, 2004 delivery while she was defending herself against [] accusations of sloppy charting. [Plaintiff] claimed that [her co-worker's] recollection of the time of delivery was mistaken and that [her] designation of the heart rate . . . was inaccurate. Plaintiff made no report of [her co-worker's] wrongdoing, and [plaintiff's] statements could be seen by the Hospital as a defense of her performance and not as a report of the violation of a government policy. Thus [plaintiff's] claim cannot satisfy the jeopardy element.

286 F. App'x 256, 265 (6th Cir. 2008) (unpublished).

Like the plaintiff in *Avery*, Trout's report of the safety violation occurred only after she received an unsatisfactory work performance evaluation. FirstEnergy could have reasonably viewed her report as a defense of her work product (by pointing to other employees that were making mistakes), rather than as a safety complaint related to a governmental policy.

For these reasons, we agree with the district court and hold that Trout failed to establish the jeopardy element, thus defeating her claim for wrongful discharge in violation of Ohio public policy.

C.

Finally, Trout asserts that she is not obligated to reimburse FirstEnergy under the Relocation Repayment Agreement ("Agreement") because she was illegally terminated. However, the Agreement obligates Trout to repay all relocation expenses "[i]f within twelve (12) months of [her] new assignment, [she] [is] discharged for disciplinary reasons . . . or violations of company policy[.]" Trout's termination letter expressly states that she was fired for "violations of Company work rules and policies[.]" Because Trout's argument is entirely dependant upon the alleged illegality of her termination, the district court's ruling will stand.

We therefore affirm the district court's order awarding FirstEnergy reimbursement of Trout's relocation expenses under the Agreement.

III.

For these reasons, we affirm the judgment of the district court.