**NOT RECOMMENDED FOR PUBLICATION**
File Name: 15a0270n.06

No. 14-3522

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 14, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PAM HALE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MERCY HEALTH PARTNERS, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, GRIFFIN, and WHITE, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Pam Hale worked for defendant Mercy Health Partners until she was fired for modifying her timesheets and failing to comply with Mercy's timekeeping rules. She alleges that her termination violated, among other things, the Age Discrimination in Employment Act, and the public policy of the state of Ohio. The district court granted Mercy's motion for summary judgment on all claims, and Hale appealed. For the reasons set forth below, we affirm.

I.

Hale, who was forty-four years old at the time of her termination, was a buyer for Mercy. She began working for Mercy in 1999 and continued until 2011, when she was terminated for violating Mercy's timekeeping policy. Although Hale split her time between Mercy's Anderson and Clermont campuses, she spent most of her time at the Anderson campus.

Hale was primarily responsible for controlling inventory and purchasing drugs for use at Mercy's Anderson hospital. She was also the primary timekeeper for the Anderson pharmacy; that meant she "did the edits" for her coworker's timesheets and overtime records. As a timekeeper, Hale was responsible for editing and sometimes approving other Mercy Anderson pharmacy employees' timesheets.

Mercy's policy requires its employees to record time by clocking in and out over a phone system. Hale attended a training in 2008 regarding proper timekeeping procedures. There, she was advised that "timekeepers may not edit timecards . . . in any . . . way . . . to change the time actually worked by the employee;" and that "a timekeeper falsifying or tampering with employees' timecards can . . . be a reason for . . . termination."

Despite this training, instead of using the phone system to clock in and out, in accordance with Mercy's policy, Hale would note her time and later enter her hours into the computerized time system. When she worked offsite, or from home, Hale would alter her time records to add time accordingly.

On June 10, 2011, Hale spoke on the phone with a Drug Enforcement Agency (DEA) agent who asked her about the Clermont campus's recordkeeping regarding drugs that were ordered for the Clermont campus but used at Mercy's offsite emergency room in Mt. Orab. Hale told the agent that she always properly filed the correct DEA forms, but could not be sure that other buyers did the same. Hale called her supervisor, Bill Carroll, and informed him that the DEA was "checking on the Mt. Orab situation," but did not tell any other Mercy personnel about the call.

About an hour before Hale received the phone call from the DEA, Mercy Clermont's CEO, Gayle Heintzelman, received a phone call about an inventory problem from a pharmacist.

The pharmacist contacted Heintzelman because he could not locate Hale. Concerned about Hale's absence, Heintzelman emailed Laura Gaynor, a senior human resources consultant at Mercy Clermont, and ordered her to audit Hale's time records to determine how much time Hale was spending at each Mercy facility. Gaynor conducted the audit and emailed Heintzelman that the results were "very interesting." Gaynor sent the results of the audit to Mercy's human resources director, Shelly Sherman. Gaynor told Sherman that, although Hale was scheduled to spend forty hours per pay period at Clermont, she averaged only sixteen hours per pay period. The audit also revealed that Hale: (1) had not clocked in or out using the phone system for all four pay periods covered by the audit, despite being within the class of employee required to use the phone system; (2) edited her own time, including some "questionable edits" such as "adding an hour to her clock out 3 days later"; (3) claimed time worked before actually entering the time; (4) repeatedly failed to clock out for lunches and edited her timesheets days later; and (5) submitted two self-approved timesheets and some with no approval at all. Gaynor forwarded these same findings to Heintzelman.

On June 14, 2011, Hale was told that she was to meet with Heintzelman at 2:00 that afternoon. She told Carroll about the meeting ahead of time, and Carroll did not know the reason for the meeting. However, prior to the 2:00 meeting, Carroll met with Sherman and Heintzelman, who showed him the audit. Sherman and Heintzelman asked Carroll if he could explain the timesheet discrepancies revealed in the audit; Carroll said he could not. Carroll was told that if Hale could not explain the discrepancies at the 2:00 meeting, Sherman and Heintzelman "would move on to termination" and that Carroll was to prepare a schedule without Hale on it.

Heintzelman and Gaynor were both present at the 2:00 meeting. Gaynor asked Hale to review the audit of her timekeeping, which was over twenty pages long. Plaintiff averred she had not seen a document like it before. Hale asked if she could get her calendar to explain the edits to her timekeeping, but Gaynor refused. Gaynor and Heintzelman asked Hale to explain the edits, but she could not; however, Hale did not deny making the edits. Hale now admits that what she did was unethical, but insists that it was how she was trained to enter her time. According to Heintzelman, when confronted at the meeting with her edits, Hale hung her head and said "I should not have done it."

At the meeting, Hale was presented with termination documents. Hale believed that the decision to terminate her had been made before the meeting. The stated reason for Hale's termination was "[f]alsifying timekeeping records" and approving her own timesheet in violation of the timekeeping policy.

After her termination, Hale filed an internal grievance with Mercy's resolution team requesting reinstatement with no timekeeper duties. In her grievance letter, Hale admitted that "[w]hat [she] did was unethical," but also claimed that her termination was "unethical." She acknowledged that clocking her time by computer rather than by the phone system was "unacceptable," but "became a convenience." The resolution team recommended Mercy uphold Hale's termination. Hale's termination was ultimately affirmed by Mercy's chief operating officer.

Hale filed for unemployment compensation benefits. During those proceedings, Hale successfully subpoenaed her time-records audit, which Mercy had previously refused to provide her. The Ohio Unemployment Compensation Review Commission hearing officer found that

Mercy did not establish that Hale "knowingly falsified time records" and concluded that Mercy terminated Hale without just cause.

The U.S. Equal Employment Opportunity Commission dismissed Hale's charge of discrimination on June 29, 2012, and issued a right-to-sue letter. Hale then brought suit in the district court, alleging age discrimination under the ADEA, 29 U.S.C. §§ 621–634; sex discrimination under Ohio Revised Code § 4112.02; and wrongful termination in violation of Ohio public policy. The district court granted Mercy's motion for summary judgment on all claims. Hale timely appealed only her ADEA and Ohio public policy claims.

## II.

We review the district court's grant of summary judgment de novo and its findings of fact for clear error. *U.S. ex rel. Wall v. Circle C Constr., L.L.C.*, 697 F.3d 345, 350 (6th Cir. 2012). Summary judgment is appropriate when, viewing the facts and drawing all inferences in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 351 (internal citation and quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party"[;] however, "[a] mere scintilla of evidence . . . is not enough for the non-moving party to withstand summary judgment." *U.S. ex rel Wall,* 697 F.3d at 351 (citations and internal quotation marks omitted).

## III.

We turn first to Hale's ADEA claim. Under the ADEA, it is unlawful for an employer to discharge an employee who is at least forty years old because of the employee's age. 29 U.S.C. §§ 623(a)(1), 631; *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008). Where,

as here, a plaintiff has no direct evidence of age discrimination, we rely on the familiar *McDonnell Douglas* burden shifting framework to determine the "ultimate question" in every case in which disparate treatment is alleged: "'whether the plaintiff was the victim of intentional discrimination.'" *Geiger v. Tower Auto.*, 579 F.3d 614, 620, 623 (6th Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)).

Under the *McDonnell Douglas* framework, the plaintiff must first state a prima facie case by showing "1) that she was a member of a protected class; 2) that she was discharged; 3) that she was qualified for the position held; and 4) that she was replaced by someone outside of the protected class." *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010). Once a plaintiff establishes a prima facie case, "the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Id.* (citing *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008)). If the employer satisfies this burden, the burden of production then shifts back to the plaintiff to show that the employer's proffered legitimate, nondiscriminatory reason for the adverse employment action was mere pretext for intentional discrimination. *Allen*, 545 F.3d at 394. At all times, however, the ultimate burden of persuasion remains with the plaintiff to show "that age was the but-for cause of [his or her] employer's adverse action." *Geiger*, 579 F.3d at 620 (internal citation and quotation marks omitted).

An employer may still prevail at the pretext stage, however, under the so-called honest-belief rule. That rule states that "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (internal quotation marks omitted). "An

employer's pre-termination investigation need not be perfect in order to pass muster under the rule." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014) (citing *Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 285 (6th Cir. 2012)). "The key inquiry is instead 'whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* (quoting *Seeger*, 681 F.3d at 285). "And to rebut an employer's invocation of the rule, the plaintiff must offer some evidence of 'an error on the part of the employer that is too obvious to be unintentional.'" *Id.* (quoting *Seeger*, 681 F.3d at 286).

Here, the parties concede that Hale established a prima facie case under the ADEA. The dispositive issue is whether Hale has successfully established pretext and, relatedly, whether Mercy has established that its reasons for terminating Hale fall within the ambit of the honest-belief rule. We conclude that Hale has failed to establish pretext and that Mercy's beliefs as to its reasons for termination were honestly held. We therefore affirm the judgment of the district court.

Mercy's proffered legitimate, nondiscriminatory reasons for its termination decision is that Hale altered her timecards and failed to use the phone system to log her time, as required by hospital policy. Indeed, the audit performed on Hale's records indicated that she had altered her own time, failed to clock in and out using the phone system, spent less time at the Clermont campus than she was supposed to, and entered hours worked before actually working them. In short, the findings in the audit indicated that Hale violated the practices explained to her in her April 2008 training session, where plaintiff was told, among other things, that she "may not edit timecards to . . . in any . . . way . . . change the time actually worked." Hale was also told that altering timecards could be a reason for termination.

Hale responds that these reasons were pretext and that Mercy did not honestly believe these reasons. Hale principally argues that Mercy improperly concluded that her alterations to her timesheets were "falsifications" without giving her an opportunity to explain her alterations using her calendar. Hale also argues that it was improper for Mercy to have made the decision to terminate her prior to the termination meeting. We disagree.

It was reasonable for Mercy to infer, based on the alterations plaintiff made to her timekeeping records—facts on which Mercy relied in its termination decision—that Hale was falsifying her timecards. Moreover, Hale points to no evidence indicating that defendant was required to give her an opportunity to explain her conduct before terminating her. There was no policy or procedure in place at Mercy requiring that employees be given such an opportunity to explain, nor does Hale argue that she had a due process interest in continued employment requiring that she be given notice and an opportunity to be heard prior to termination. *See Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997) (explaining that in some circumstances, employees have a liberty interest in continued employment and that such an interest requires that the employee be given notice and an opportunity to be heard prior to termination). Hale's only authority for the proposition that she was entitled to an opportunity to explain her conduct derives from a district court decision from Maryland and a state-law decision from Connecticut. Obviously, these decisions are nonbinding. And, to the extent they stand for the proposition that an employer is required to give an at-will employee an opportunity to offer an explanation for terminable conduct as a matter of law, they are inconsistent with the law of this circuit, which holds that pre-termination investigations "need not be perfect in order to pass muster under the [honest-belief] rule." *Loyd*, 766 F.3d at 591. For similar reasons, it was not improper for Mercy to make the decision to terminate Hale prior to meeting with her.

At the time Mercy fired Hale, it had obtained the timecard audit which revealed Hale's misconduct and met with Hale's supervisor, Carroll, about the audit's findings. Our precedent indicates that this was sufficient for Mercy to meet its burden to show that its belief that Hale falsified records was reasonably informed and therefore honest. *See Tingle v. Arbors at Hilliard*, 692 F.3d 523, 532 (6th Cir. 2012) (finding an employer's investigation sufficient to establish an honest belief where the employer "spoke to witnesses" before issuing a disciplinary report, and noting that "[t]his court has found far less robust investigations sufficient to substantiate an honest belief entitling an employer to summary judgment"); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 599 (6th Cir. 2007) (finding an employer's investigation sufficient to substantiate its honest belief where it interviewed the plaintiff's coworkers, even though one of them testified that the investigation merely "boiled down to 'he said/she said'"). Hale's argument that Mercy failed to give her an opportunity to explain herself demonstrates, at most, that Mercy's decision-making process was not optimal. But, simply showing a non-optimal decision-making process is insufficient to overcome the honest-belief rule. Rather, plaintiff was required to show that defendant's decision-making process was "an error . . . too obvious to be unintentional." *Tingle,* 692 F.3d at 531 (internal quotation marks omitted). Hale has failed to do so.

Hale argues that she never actually "falsified" time records. However, she admits to altering them. Ultimately, this distinction is immaterial to our conclusion. Under the relevant legal standards, a defendant is not required to "prove" the underlying truth of its belief. Indeed, an employer's belief can still be reasonably informed—and therefore honest—even if it "is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). Thus, the inquiry is not whether Hale actually falsified her timecards;

the inquiry is whether, based on the information available to it at the time of Hale's termination, Mercy's belief that she falsified her timecards was reasonable and therefore honest. *See McDole v. City of Saginaw*, 471 F. App'x 464, 477 (6th Cir. 2012) ("[I]t does not matter whether the [defendant] mistakenly believed [the plaintiff] assaulted [a coworker, which was defendant's proffered reason for terminating the plaintiff]; it only matters if [the defendant] intentionally discriminated against [the plaintiff]."). For the reasons stated above, i.e. the discrepancies revealed by the audit and the discussion with Carroll about it, we conclude that it was reasonable for Mercy to infer that Hale was falsifying her timecards. However, even if Hale were able to establish that Mercy's belief that she falsified her timecards was not honestly held, she could still not prevail. Mercy's policy did not provide that termination was a consequence only of falsification of records. Rather, in the training, Hale was informed she could be terminated for "edit[ing] . . . or in any other way chang[ing]" timesheets. And, there is ample evidence to support Mercy's belief that Hale "change[d]" her timesheets.

Hale also argues that it was improper for Mercy to terminate her for conduct that other, younger, workers also engaged in. Specifically, she argues that Craig Wright, Abigail Muchmore, and Donna Branham—all younger workers than Hale—also edited their own timecards and were not disciplined for doing so. We disagree. Although it is true that subsequent investigations of other employees' timekeeping policies revealed that others had engaged in improper timekeeping conduct similar to Hale and were not fired, this fact does not change our conclusion. It is undisputed that these separate investigations were conducted *after* the decision to terminate Hale. And, this court judges the honesty of an employer's belief based on the "particularized facts that were before [the employer] at the time the decision was made." *Seeger*, 681 F.3d at 285 (citation omitted). Thus, Hale cannot show that Mercy's belief was not

honestly held because Mercy was unaware of other employees' similar conduct at the time it made its termination decision.

Finally, Hale argues that the fact that Mercy gave inconsistent reasons for conducting the audit on her timesheets is indicative of pretext. Again, we disagree. The ultimate question here is whether Mercy's belief that Hale violated Mercy's timekeeping policy was honestly held. And, given that there was substantial evidence that Hale did modify her timesheets (including her own admissions that she did so), we cannot conclude that the fact that Mercy offered inconsistent reasons for its audit alone shows pretext.

For these reasons, we conclude that Hale has failed to establish that Mercy's belief that she altered or falsified her timecards was not honestly held. Hale has accordingly failed to show that Mercy's proffered nondiscriminatory reason for termination was pretextual. We thus affirm the judgment of the district court on Hale's ADEA claim.

IV.

We next turn to Hale's Ohio public policy claim. Ohio recognizes a "public policy" exception to the employment-at-will doctrine. *Pytlinski v. Brocar Prods., Inc.*, 94 Ohio St. 3d 77, 78 (2002). To establish a claim for wrongful termination in violation of Ohio public policy, a plaintiff must show: (1) "a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element)"; (2) dismissal "under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element)"; (3) "the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element)"; and (4) lack of an "overriding legitimate business justification for the dismissal (the overriding justification element)." *Collins v. Rizkana*, 73 Ohio St. 3d 65, 69–70 (1995) (emphases omitted). The first and second elements

are questions of law for the court to decide, but the jury decides questions of fact relating to the latter two elements. *Id.* at 70.

Hale argues that Mercy discharged her in violation of public policy because Hale responded to the DEA agent's question, stating that she could not say whether Mercy Clermont buyers were properly completing required DEA forms. We disagree.

In resolving this claim, we address the elements of the relevant legal test in turn. We first address the clarity element. To satisfy this element, a plaintiff must point to a specific provision in the "federal or state constitution[s], federal or state statutes, administrative rules and regulations, or common law." *Dohme v. Eurand Am., Inc.*, 130 Ohio St. 3d 168, 174 (2011). Although this is an employment discrimination case, there is "no requirement that a supporting statute be employment-related or otherwise set forth an employer's responsibilities and/or an employee's rights." *Alexander v. Cleveland Clinic Found.*, No. 95727, 2012 WL 1379834, at *6 (Ohio Ct. App. Apr. 19, 2012), *perm. app. denied*, 132 Ohio St. 3d 1485 (2012).

Hale claims Ohio Administrative Code § 4729-17-03 states the relevant clear public policy.[1] As plaintiff correctly summarizes, that regulation provides that institutional "pharmacies maintain proper transport and record-keeping processes to ensure the narcotics are properly accounted for by the pharmacies."

The district court correctly noted that Ohio courts require that a plaintiff's claimed policy parallel Ohio's whistleblower statute, Ohio Revised Code § 4113.52. To parallel that statute, the policy on which the plaintiff relies must (1) impose "an affirmative duty on the employee to

---

[1]In opposition to Mercy's summary judgment motion, Hale also identified another public policy: Ohio Revised Code § 2921.13(7), which prohibits a person from making a false statement in connection with a government report. The district court rejected this argument. Hale does not invoke this statute on appeal.

report a violation, [(2)] specifically prohibit[] employers from retaliating against employees who had filed complaints, or [(3)] protect[] the public's health and safety." *Dean v. Consol. Equities Realty #3, L.L.C.*, 182 Ohio App. 3d 725, 729 (2009). We agree with the district court's conclusion that Ohio Administrative Code § 4729-17-03 did not parallel the whistleblower statute because the regulation does not require employees to report violations and does not prohibit employer retaliation. Nor does the regulation specifically protect Mercy's patients because, as the district court noted, it merely imposes "baseline technical requirements that [institutional pharmacies have] to satisfy to operate."

Hale argues that we should focus on her decision to comply with the law (i.e., answering the DEA agent's question truthfully) and not on whether the regulation is a baseline technical requirement. She interprets the Ohio regulation to protect her from "retaliation for telling a government agency that she could not confirm that all of [Mercy's] employees were complying with the regulation." However, Hale does not challenge the district court's conclusion that the regulation does not parallel the whistleblower statute. Nor does Hale argue that she was terminated for reporting a violation of the regulation, or any other statute or rule. Thus, Hale has failed to establish the clarity element of the test for wrongful termination under Ohio law.

We next turn to the jeopardy element. We have applied a three-part test for determining whether a plaintiff has satisfied the jeopardy element. We must:

> (1) determine what kind of conduct is necessary to further the public policy at issue; [(2)] decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal.

*Avery v. Joint Twp. Dist. Mem'l Hosp.*, 286 F. App'x 256, 264 (6th Cir. 2008) (quoting *Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003)). In addition, the "employee's statements

must indicate to a reasonable employer that [she] is invoking governmental policy in support of, or as the basis for, [her] complaints." *Avery*, 286 F. App'x at 265 (internal quotation marks omitted). Here, although we agree with Hale that reporting record keeping violations would further the public policy embodied in § 4729-17-03, it is not clear that Hale ever reported anything to anyone. When contacted by the DEA agent, Hale was asked whether she complied with record keeping requirements, and she reported that she did. She did not, however, report any violations, informing the DEA agent that *she did not know* whether others were out of compliance.

For these reasons, Hale has failed to establish two essential elements of an Ohio public policy claim. Because she was required to establish all five, her public policy claim fails, and, thus, we conclude that the district court did not err by granting summary judgment in Mercy's favor on this claim.

V.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Mercy.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.**

I agree the district court properly entered summary judgment on Hale's public-policy claim; however, I do not agree that summary judgment was appropriate on her age-discrimination claim. By failing to view the record in the light most favorable to Hale, and misapplying the applicable law, the majority erroneously concludes that Hale failed to prove that Mercy did not honestly hold a belief that it discharged Hale because she falsified her timekeeping records. To the contrary, a jury could reasonably conclude that Mercy's proffered reasons for dismissing Hale were not honestly held and were pretext for unlawful age discrimination.

## I.

The majority missteps at the beginning of its analysis of Mercy's honest-belief defense when it states "Mercy's proffered legitimate, nondiscriminatory reasons for its termination decision [are] that Hale altered her timecards and failed to use the phone system to log her time, as required by hospital policy." Maj. Op. 7. Although Gaynor identified those reasons as "serious" problems if Hale could not explain them, Mercy in fact dismissed Hale, according to the discharge letter, for "[f]alsifying timekeeping records" and "[a]pproving own time sheet."[1] Thus, the relevant question is whether Mercy honestly believed Hale falsified her time records and approved her own timesheet in violation of its policy.

---

[1] The majority also holds that "there is ample evidence to support Mercy's belief that Hale 'change[d]' her timesheets." Maj. Op. 10 (alteration in original). This was not a basis for Mercy's decision, and even if it were, Mercy's policy does not prohibit all "change[s]" to one's timesheet but rather "edit[s] [to] timecards to . . . change *the time actually worked*." (Emphasis added.) The record evidence supports that Hale edited her timesheets to reflect the time she actually worked—not to steal time.

There is no record evidence that Hale falsified her timesheets, i.e., recorded hours she did not actually work. But the majority concludes that it was reasonable for Mercy to infer from the timecard alterations that Hale falsified her time records. That conclusion belies the facts. According to Heintzelman, Mercy's termination process includes a discussion with the employee "to go through what the issues are" and if the employee cannot satisfactorily explain the alleged misconduct, "then we move to the next step[,] which would be termination according to our policies."[2] Accordingly, Mercy provided Hale a termination hearing, and, as Heintzelman testified, warned Hale that if she could not explain the alterations, she would be discharged. Thus, contrary to the majority's view, Mercy inferred from Hale's failure to explain the edits that she falsified her time—not from the alterations themselves. And that inference is unworthy of credence.

Mercy's decision to dismiss Hale was not reasonably informed and considered. *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 286 (6th Cir. 2012). At the termination hearing, Mercy denied Hale's request to consult her calendar and other sources to aid her in explaining her timecard edits, even though it had asked her for an explanation. Under the modified-honest-belief rule, the employee "must be afforded the opportunity to produce evidence to the contrary." *Id.* (internal quotation marks omitted). But because Mercy assumed without proof that Hale stole time, it did not reasonably rely on the "particularized facts that were before it at the time the decision was made." *Id.* (internal quotation marks omitted). Had Mercy sought to make an informed and considered decision, it would have afforded Hale a meaningful opportunity to

---

[2] For this reason, the majority is incorrect that "Hale points to no evidence indicating that defendant was required to give her an opportunity to explain her conduct before terminating her." Maj. Op. 8.

explain the timecard alterations and allowed her to consult her calendar.[3]  Moreover, Hale's supervisor, Bill Carroll, had offered an explanation before the discharge meeting for Hale's timecard edits,[4] but it does not appear Mercy considered the proffered explanation, despite Heintzelman's testimony that Mercy would have investigated any explanation given.

## II.

Viewing the evidence in the light most favorable to Hale, and considering the totality of the evidence, Hale has shown that Mercy's reasons were pretextual.  A jury could reasonably find that Mercy's rationales were pretext for unlawful discrimination because, coupled with a showing that Mercy did not hold an honest belief in the reasons for discharging Hale, Mercy offered conflicting reasons for auditing Hale's time records and did not discipline Abigail Muchmore, the 30-year-old buyer in Mercy Clermont's pharmacy, even though she also altered her timesheets.

Mercy claims Heinzelman ordered the audit of Hale's time records at 10:00 a.m. after a Mercy Clermont pharmacist informed her that he had an inventory issue and could not locate Hale to resolve it.  Heintzelman did not attempt locate or contact Hale, or any other personnel in the pharmacy, including Muchmore, who was the Mercy Clermont buyer.  The record supports four other explanations for the audit: (1) Hale averred that Gaynor told Hale in the termination meeting that Mercy reviewed Hale's time records as a result of a random audit; (2) According to a June 10, 2011, 6:39 p.m. email, Heintzelman asked Gaynor if Hale "clocked out or marked

---

[3] Although Hale also admitted that she occasionally approved her own timesheets, Heintzelman and Gaynor did not question Hale on this alleged violation of Mercy's policy, which formed a basis of her dismissal.  Mercy's failure to investigate the alleged violation is additional evidence that Mercy did not reasonably rely on an informed and considered decision.

[4] Carroll told Heintzelman that Hale's after-the-fact added time could be due to Hale attending offsite meetings.

herself out" after receiving a 4:39 p.m. email from the pharmacist saying he could not locate Hale; (3) Gaynor testified that Heintzelman ordered the audit a couple of weeks before June 10, 2011, to determine the amount of time Hale was spending at Mercy Clermont; and (4) Another HR consultant, Angie Ferrell, told Mercy's third-party administrator that Mercy investigated Hale's time records because her "manager became concerned that abuses of the timekeeping system were occurring," which Carroll disputed.

Hale contends that these inconsistent explanations for the audit of her time records support an inference of pretext because the record "shows a cover-up and an incredible explanation of why [Hale] was singled out for a completely unnecessary time-card audit." Indeed, Mercy's inconsistent reasons and unequal treatment of Hale in relation to Muchmore who was the buyer for the pharmacy involved tend to support a finding that Hale's alleged policy violations did not actually motivate Mercy's decision to discharge her. *See Tinker v. Sears Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997).

Further, Mercy's pharmacy department employees, including Muchmore, had for years recorded time as Hale did, and the pharmacy director himself testified he was unaware of Mercy's policy prohibiting alterations of timecards. Despite learning that Muchmore engaged in the same conduct as Hale, Mercy did not discipline or dismiss Muchmore. Mercy's adherence to its timekeeping policies—strictly in Hale's case and not at all in Muchmore's—precludes summary judgment.

For these reasons, I concur in part and dissent in part.